74 So.2d 232

### PITTS v. STATE.

#### 6 Div. 664.

Supreme Court of Alabama.

June 24, 1954.

Rehearing Denied Aug. 30, 1954.

E. D. McDuffie, deGraffenried, deGraffenried & deGraffenried, Tuscaloosa, for appellant.

STAKELY, Justice.

Reed Pitts (appellant) was indicted for the offense of murder in the first degree. Trial was had upon a plea of not guilty. The jury found the defendant guilty as charged and fixed his punishment at imprisonment in the penitentiary for life. The court accordingly adjudged the defendant guilty and sentenced him to imprisonment in the penitentiary for life. From such judgment and sentence this appeal is prosecuted.

Si Garrett, Atty. Gen., and Robt. Straub, Asst. Atty. Gen., for the State.

The defendant operated a cafe on the Birmingham-Tuscaloosa Highway in Tuscaloosa County, Alabama. The deceased Allison Bunn and one Ormond Morrison went to the defendant's place of business about noon on October 4, 1953. They drank several cans of beer while watching a baseball game on the television set. During the course of the afternoon other persons came and left the place of business and some stayed and watched the baseball game. During the afternoon the group began to roll high dice for beer. When they had enough beer they began to throw for a dollar a time. Apparently all was on a friendly basis until Reed Pitts, the appellant, got into the game. Shortly after he entered the game, he

316

stopped the dice which the deceased had thrown and accused the deceased of sliding the dice. The two had a few words and the deceased left the defendant's cafe. There is some testimony that at that time the deceased had one hand in his pocket. The defendant testified that the deceased had a knife in his hand. Reed Pitts went to the back room of the cafe and returned with a pistol in a holster. He followed Allison Bunn out to the truck of Allison Bunn and they had a conversation. Testimony for the State tended to show that Reed Pitts was waving his pistol in the face of Allison Bunn. Reed Pitts contends that he had his pistol in his pocket during the conversation. In either event, it appears that Allison Bunn got possession of the pistol and started to drive away. Reed Pitts called him back, demanding the return of his pistol. Allison Bunn thereupon turned the pistol over to Reed Pitts and asked for four cans more of beer. Reed Pitts told Allison Bunn he could have the beer if he had money with which to pay for it. The two men returned to the cafe and Reed Pitts went into the back room and immediately returned with a rifle, which was discharged as he reached the doorway between the front and back rooms of the cafe. It is the contention of Reed Pitts (appellant) that he was bringing the rifle out to place it near the cash register, as was his custom in the evening, and that the rifle was discharged accidentally. The bullet struck Allison Bunn in the groin and severed an artery. Reed Pitts and two others placed Allison in a car and the other two men drove him to the hospital where he died. The shooting took place in the middle of the afternoon.

Reversal is sought on various rulings by the court on the evidence, which will be considered separately and in the order in which they are presented in brief of counsel for the appellant.

I. Error is predicated upon the court's ruling in sustaining the State's objection to the following question propounded by counsel for the defendant to the State's witness Royce Clary on cross-examination: "Q. Down at the old place, when you worked for him, did he customarily keep that 22 Hornet Rifle up in the front of his place near the cash register in the evening? Keep it up there over night?"

■ The testimony showed that the appellant had been operating the place of business where the fatal shooting took place only since August 6, 1953. The witness to whom the question was propounded had worked for the appellant at his old place of business, which was the Crimson Court, and which appellant had been running until he began operating the present place of business. It is the contention of the appellant that he picked up the rifle in question when he went into the back of his place to return the pistol, in order to bring the rifle to the front portion of his place of business and place it near to the cash register, where he customarily kept it in the evenings. It does not seem to us that the testimony is of such relevancy as to put the court in error for refusing its admission. Evidence of the custom or habit of the defendant at his old place of business under conditions which are not shown to have been similar to the conditions involved in the situation in the case at bar, seems to us to be so remote or have such tendency to produce confusion in its collateral bearing on the issue in this case, as to allow the court in its discretion to exclude the evidence here. Sorrell v. Scheuer, 209 Ala. 268, 96 So. 216; 31 C.J.S., Evidence, § 180, pp. 881–882. We call attention to the fact that what might have been a custom or habit at the old place of business in the evening has little if any bearing on what the defendant did in the middle of the afternoon at the place of business which he was operating at the time of the shooting.

■ II. It is insisted that the court was in error in sustaining the State's objection to the following question propounded in behalf of the defendant to the State's witness Ormond Morrison on cross-examination: "Q. You knew that argument was over?" It is enough to say that no exception was reserved to the court's ruling here under consideration. Dowling v. State, 151 Ala. 131, 44 So. 403.

III. Error is based upon the ruling of the court in overruling appellant's objection to the following question propounded by the State to the witness Dick Elliott on cross-examination. "Q. Now would you believe him on oath where he personally was interested in the outcome of the case? Based on his reputation?" It is the contention of the appellant that on direct examination of the witness as to reputation, he can only be asked whether or not he would believe the person sought to be impeached on oath, based on his general reputation for truth and veracity and the witness should not be asked whether he would believe him in the case where the person sought to be impeached was personally interested in the outcome thereof.

■ In the instant case the defendant testified as a witness in his own behalf. Accordingly his credibility may be impeached in the same way or ways in which the credibility of any other witness may be impeached. Stone v. State, 208 Ala. 50, 93 So. 706; Mealer v. State, 242 Ala. 682, 8 So.2d 178. If the impeaching witness first testifies that he knows the general reputation of the witness for truth and veracity in the community in which he resides and then testifies that it is bad, the State may inquire whether the witness would believe the person inquired about on oath. Stone v. State, supra. In the present case the witness was first asked if he knew the general reputation of the defendant for truth and veracity prior to October 3, 1953, to which the witness replied that he did. Then he was asked, "Was it good or bad?" to which he replied, "I'd say it was bad." The witness was then asked, "Now would you believe him on oath where he, himself, was personally interested in the outcome of the case—based on his reputation?" to which the witness replied, "No, sir, I don't."

■ There was no error in the ruling. After the impeaching witness has testified that the general reputation of the witness for truth and veracity in the community where he lives is bad, he may be asked whether from that reputation he would believe him on oath in a case in which he was personally interested in the outcome. Knight v. House, 29 Md. 194, 96 Am.Dec. 515.

IV. The appellant seriously contends that there was error in the ruling of the court concerning character witnesses. The State had previously introduced the testimony of a number of witnesses who testified that the general reputation of defendant in the community in which he lived was bad. There had been approximately 21 character witnesses to testify for the State in this connection. The court asked that the remainder of the character witnesses be brought in. According to the record there were ten in number. The defendant interposed an objection to the witnesses called up in this manner. The solicitor asked counsel for the defendant if they would admit that the ten witnesses standing before the court would testify that they were acquainted with the defendant and knew his reputation before October 3rd and that it was bad. Counsel for the defendant answered: "No, we offered in the beginning to stop, to save time, but you declined it, to do that, and we think now that under the ordinary rules of procedure there has been enough time taken up with character witnesses and we just simply want to object to any further testimony along this line and we further object to the parade of the ten or twelve witnesses who are now standing up for some purpose in the presence of the jury along this line."

The solicitor then said, "Your Honor please, we will be perfectly willing to use the witnesses. We understand that we have used a lot of them. This morning they did offer that we parade the witnesses there and ask them a general question. Now, they have continued to object to us introducing the witnesses constantly for the last eight or ten witnesses we have introduced. And I don't know any other way—we're perfectly willing to give them the opportunity to cross-examine them if that's what they want. If they don't want us to question them any further, we're perfectly willing." The solicitor for the defendant then said, "If your Honor please, in view of the fact that the testimony in the very beginning

along this line was limited only to the question of truth and veracity of the defendant and for that purpose alone, we move for a mistrial now on account of the number of character witnesses who testified and further on account of the witnesses that are now standing up here for that purpose now, around ten or twelve of them here in court." The solicitor then said, "We're perfectly willing to do whatever they say do. * *." The solicitor for the defendant then said, "All we have asked was that the question of no more witnesses be permitted to take the stand on that proposition and no witnesses be permitted, if they're not going to take the stand to parade in front of the jury." After further colloquy the court said: "Anyway, we'll let the defendant say whether we'll let these witnesses testify or not", to which counsel for the defendant replied, "Well, we object to any further testimony along this line." The court then said, "You object then, to these witnesses testifying?" and counsel for the defendant replied, "Yes, sir." The court further said, "I believe I'll let the witnesses be seated then and we'll not put on any more character witnesses."

■■ Of course, the defendant has the right to be confronted by the witnesses against him and to cross-examine them. Wray v. State, 154 Ala. 36, 45 So. 697, 15 L.R.A., N.S., 493; Jimmerson v. State, 17 Ala.App. 552, 86 So. 153. However, the defendant cannot complain of being deprived of the right of confrontation and cross-examination where he has been given the opportunity of confrontation and cross-examination by the court.

Other matters are urged as error but such other matters are similar to some of the propositions which we have discussed. Upon our examination of the entire record, we are not willing to say that the defendant did not receive a fair trial. It results that the judgment of the lower court must be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.